IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| ALISHIA M. M., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:23CV988 |
| | ) |
| LELAND DUDEK, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Alishia M. M. ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I. PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on February 25, 2019, alleging a disability onset date of June 6, 2017 in both applications. (Tr. at 229-39, 697, 725, 773.)[1] Her applications were denied initially (Tr. at 73-96, 140-43) and upon reconsideration (Tr. at 97-134, 146-55). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 161-63.) On January 26, 2021, Plaintiff, along

---

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #5].

with her attorney, attended a telephone hearing, at which both Plaintiff and an impartial vocational expert testified. (Tr. at 773.) Following this hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 786), and on August 9, 2021, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 792-97).

Plaintiff, who resided in Iredell County, NC at that time, filed her appeal in the Western District of North Carolina on September 29, 2021. (Tr. at 798-804.) In March 2022, that Court remanded Plaintiff's claim at the request of the Commissioner, to address an apparent conflict between the Dictionary of Occupational Titles and the testimony of the Vocational Expert. (See Tr. at 807-08, 816-22.) Accordingly, on May 18, 2023, Plaintiff and her attorney attended a remand hearing via online video. Both Plaintiff and an impartial vocational expert again testified (Tr. at 697, 722-69), and the ALJ again denied Plaintiff's claims (Tr. at 712). Plaintiff did not file written exceptions to this decision with the Appeals Council, and the Appeals Council did not undertake its own review within sixty days of the decision, making the August 9, 2023 hearing decision the final decision of the Commissioner on October 9, 2023. See 20 C.F.R. § 404.984(c)–(d); 20 C.F.R. § 416.1484(c)–(d). Thereafter, Plaintiff, who now resides in Surry County, within this District, brought the present action challenging the ALJ's August 9, 2023 decision. (Compl. ¶¶ 1, 4.)

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the

2

Case 1:23-cv-00988-JEP     Document 12     Filed 03/28/25     Page 2 of 20

scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

3

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

4

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.³ Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

---

³ "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

5

III.     DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 6, 2017. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 700.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> fibromyalgia; rheumatoid arthritis; obesity; and degenerative joint disease of the knees bilaterally[.]

(Tr. at 700.) The ALJ found at step three that none of the impairments identified at step two, individually or in combination, met or equaled a disability listing. (Tr. at 703-04.) The ALJ therefore assessed Plaintiff's RFC and determined that she could perform light work with the following, additional limitations:

> [Plaintiff] should perform no climbing of ladders, ropes, or scaffolds; can perform occasional balancing, stooping, kneeling, crouching, and crawling; can tolerate frequent not constant exposure, meaning [she] should avoid concentrated exposure[] to workplace hazards such as unprotected heights and dangerous machinery; and should avoid concentrated exposure to extreme noise.

(Tr. at 704.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that Plaintiff had no past relevant work. (Tr. at 710.) However, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in significant numbers in the national economy. (Tr. at 710-11.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 712.)

Plaintiff now raises two, related challenges to the ALJ's treatment of Plaintiff's activities of daily living ("ADLs"). First, she contends that the ALJ erred "by citing Plaintiff's Activities

of Daily Living (ADLs) as a reason to discount her impairment severity without accounting for countervailing evidence regarding the nature and extent of Plaintiff's ADLs." (Pl.'s Br. [Doc. #8] at 1.) Second, Plaintiff argues that the ALJ erred "by failing to explain how Plaintiff's limited ADLs demonstrate an ability to perform full-time, competitive employment." (Pl.'s Br. at 1.) In addition, Plaintiff challenges the ALJ's failure to include limitations in the RFC assessment to account for Plaintiff's "mild" limitations in functioning and non-severe mental impairment. (Pl.'s Br. at 1.) Because Plaintiff's two challenges to the ALJ's treatment of ADLs broadly overlap, the Court considers these issues in tandem.

    A.  Consideration of Activities of Daily Living

In <u>Woods v. Berryhill</u>, the Fourth Circuit explained that "[a]n ALJ may not consider the type of activities a claimant can perform without also considering the extent to which she can perform them." <u>Woods v. Berryhill</u>, 888 F.3d 686, 694 (4th Cir. 2018); see also <u>Arakas v. Comm's of Soc. Sec.</u>, 983 F.3d 83, 100 (4th Cir. 2020) ("Even assuming, as the ALJ noted, that Arakas's daily activities have, at least at times, been somewhat greater than [she] . . . generally reported, he provided no explanation as to how those particular activities . . . showed that [s]he could persist through an eight-hour workday.") (internal citations omitted); <u>Lewis v. Berryhill</u>, 858 F.3d 858, 868, n.3 (4th Cir. 2017) ("The ALJ points to Lewis' ability to perform incremental activities interrupted by periods of rest, such as 'driv[ing] short distances of up to 30 miles, shop for groceries with the assistance of her mother or roommate, handle her finances, and watch television.' The ALJ's conclusion that Lewis' activities demonstrate she is capable of work is unsupported by the record.") (citation omitted); <u>Brown v. Comm'r</u>, 873 F.3d 251, 263 (4th Cir. 2017) ("[T]he ALJ noted that Brown testified to daily activities of living

7

that included 'cooking, driving, doing laundry, collecting coins, attending church and shopping.' The ALJ did not acknowledge the extent of those activities as described by Brown, e.g., that he simply prepared meals in his microwave, could drive only short distances without significant discomfort, only occasionally did laundry and looked at coins, and, by the time of the second ALJ hearing, had discontinued regular attendance at church and limited his shopping to just thirty minutes once a week. Moreover, the ALJ provided no explanation as to how those particular activities—or any of the activities depicted by Brown—showed that he could persist through an eight-hour workday."); see also Fletcher v. Colvin, No. 1:14CV380, 2015 WL 4506699 at *5-8 (M.D.N.C. Jul. 23, 2015).

In the present case, the ALJ recounted Plaintiff's testimony at the first hearing regarding daily activities as follows:

> [Plaintiff] described a mostly sedentary level of daily activity, alleging that she spends most of her day sitting or lying down, although she acknowledged that she is "kind of" the primary caretaker for her young son and that she spends two to four hours per day doing physical therapy on her own. She says she has difficulty picking her son up, changing him, or bathing him. She stated that her boyfriend performs most of the household cleaning and shopping and takes her to medical appointments. She said that she requires assistance in getting in and out of the bathtub and putting on her shoes, although she is able to prepare simple meals.

(Tr. at 705.) The ALJ further recounted Plaintiff's testimony at the second hearing, that:

> on a typical day, she gets her four-year-old son up and he will play the rest of the day until his father comes home and gives him a bath and gets him to bed. She said she is unable to do household chores and cannot stand long. She said she stays in her house unless she has an appointment.

(Tr. at 705.)

After discussing the medical evidence and treatment records underlying Plaintiff's claim, including testing, imaging, assessments on examination, and Plaintiff's reports to her

8

Case 1:23-cv-00988-JEP    Document 12    Filed 03/28/25    Page 8 of 20

providers, the ALJ noted that she "also considered [Plaintiff's] daily activities, medications or other treatments, the nature and frequency of [her] attempts to obtain medical treatment for symptoms, and statements by other people about [Plaintiff's] symptoms" when assessing her RFC. (Tr. at 707.) In terms of Plaintiff's activities, the ALJ noted that Plaintiff has "been capable of caring for her young son during the daytime." (Tr. at 707). The ALJ further explained that "[a]lthough [Plaintiff] reported spending much of her day lying down, there is insufficient evidence in the record that such lying down is medically necessary. Treatment notes do not document that [Plaintiff's] medical providers typically advised her to lie down for prolonged periods. . . . Further, the record does not document consistent reports of significant fatigue." (Tr. at 707.)

The ALJ again cited Plaintiff's activities when summarizing the evidence and ultimately concluding that Plaintiff was not as limited as she alleged. In pertinent part, the ALJ found that

> the record certainly documents pain and symptoms related to fibromyalgia[,] rheumatoid arthritis, and degenerative findings in various joints as well as obesity; however, the record suggests her pain and symptoms have waxed and waned, which is common to these types of impairments. With treatment and medication, she has reported improvement, and the longitudinal objective findings document fairly mild findings upon presenting for treatment, no findings that she was in acute distress, and no emergency room or urgent care treatment due to uncontrolled pain or fatigue, as well as activities including caring for her young son during the day. In considering the objective findings in combination with the claimant's medications or other treatments, the nature and frequency of the claimant's attempts to obtain medical treatment for symptoms, and statements by other people about the claimant's symptoms, the undersigned finds the claimant is not as limited as alleged.

9

Case 1:23-cv-00988-JEP     Document 12     Filed 03/28/25     Page 9 of 20

(Tr. at 708); (see also Tr. at 710) (same). "To fully account for [Plaintiff's] pain and symptoms," the ALJ ultimately limited Plaintiff to light work with the additional, non-exertional limitations set out in the RFC assessment. (Tr. at 704, 708.)

Although Plaintiff now argues that the ALJ failed to consider evidence regarding the nature and extent of Plaintiff's activities, the ALJ clearly recounted Plaintiff's testimony that her pain and other symptoms limited her ability to perform some of the physical aspects of parenting, such as baths and diaper changing. (Tr. at 705.) Moreover, the ALJ specifically noted that the evidence did not support Plaintiff's alleged need to lie down for much of the day or the level of fatigue she claimed. (Tr. at 707.) In short, the ALJ did consider "countervailing" evidence regarding Plaintiff's ADLs, but accepted this evidence only to the extent it was supported by the record as a whole. Ultimately, the ALJ's conclusion is supported by substantial evidence, including Plaintiff's own testimony and the ALJ's assessment of the record as a whole.[4]

---

[4] The record reflects that Plaintiff's son was born in 2018, and that in 2019, Plaintiff reported to her provider that "[s]he takes care of her one year old and lives with her fiance who is the baby's father." (Tr. at 569.) At the time of the hearing in May 2023, Plaintiff's son was age 4, and Plaintiff herself testified that she spends her days caring for her young son:
> Q … And so, what does a typical day look like for you, like, you know, what time do you get up? Do you make breakfast, do household chores, go to the grocery store, cook? What's a typical day look like for you?
> A  I get up at 6:00 in the morning, make me a cup of coffee. I wake my son up, make him something to eat and then it's just, he'll play the rest of the day while I'm laying on the couch or sitting down. I can't do the housework. I can't cook. I use the microwave, that's the only way I can cook anything is to microwave because I can't stand very long. About lunchtime, we'll eat and then he'll lay down and take a nap, and then he'll get up and he'll go outside and play or play around the house or whatever. I have help with my neighbor. She helps me with him while my son's father is at work, or my mother will help me through the day. She'll come clean and she'll cook for me sometimes, or my neighbor will cook for him. And then at nighttime my son's father will give him a bath after he's eaten and then we go to bed around 9: 00.
> . . . .
> Q  Okay. All right. So, the rest of the day, are you watching TV, are you reading, gardening, what else are you doing?

As for Plaintiff's second challenge regarding the treatment of her ADLs, the ALJ again made clear that the evidence as a whole, not just Plaintiff's ability to care for her son, demonstrated that she could perform a limited range of light work for a full, 8-hour workday. (See Tr. at 707.) In addition to Plaintiff's activities, the ALJ considered and discussed at length the effect of Plaintiff's medications or other treatments, the nature and frequency of her medical treatment, statements by both Plaintiff and others regarding her symptoms, the assessments by Plaintiff's providers regarding the effect of her impairments on her functioning

---

> A Pretty much just keeping an eye on my son. He watches cartoons. I'll teach him -- try to teach him things but I don't do very good a job of teaching. But pretty much I'm either sitting or standing or laying on the couch or massaging or doing some physical therapy stretches and stuff, is pretty much the gist of my day.
> Q Okay. All right.
> ....
> Q So, we're talking about your hands, how often do they swell up?
> A They're swollen right now.
> ....
> A It's -- probably tomorrow it may go down for a little but then after a while it swells back up. But then I have a four-year-old, you have to understand that I have to interact with him and then my hands will start swelling.
> Q But you're not picking him up.
> A No. I cannot pick up him up. No.
> Q So, when you say you're interacting it means what? Just putting stuff in the microwave?
> A That and putting, trying to put his clothes on. I struggle with that. And just trying to play with him and dealing through out the day because I don't want to neglect my child, you know.
> Q But yeah, but you're not getting on the floor --
> A No, I can't get on the floor.
> Q And you're not playing --
> A No. I sit on the couch or in the chair or I'll stand up for a few minutes and get him to dance around and stuff.
> Q You're not dancing with him?
> A No. I can't. I follow where he goes.

(Tr. at 734-35, 737, 748-49.) In the briefing, Plaintiff contends that she has assistance from her mother, her neighbor, and the child's father, although Plaintiff's brief also notes that Plaintiff's mother reported that she sees Plaintiff only one to two days per month. (Pl. Br. at 9-10, 12, Tr. at 1027.) In addition, Plaintiff testified that the child's father works during the day (Tr. at 728) and helps at night, as noted above. The ALJ's decision references Plaintiff's care for her young son *during the day*. Plaintiff also testified that her neighbor will sometimes cook or help with chores (Tr. at 742), and the ALJ specifically acknowledged Plaintiff's testimony that "she is unable to do household chores." (Tr. at 705.) Thus, this is not a case where the ALJ mischaracterized or misconstrued the testimony.

11

on examination, and other medical records including imaging and testing. (Tr. at 705-08, 710.) The ALJ also considered medical opinion evidence, including the findings of the State agency medical consultants, when assessing Plaintiff's RFC. Significantly, the State agency medical consultants at the initial level opined that Plaintiff could perform a reduced range of light work, while the consultant at the reconsideration level opined that Plaintiff remained capable of a reduced range of medium work. (Tr. at 708-09) (citing Tr. at 79-81, 127-28). The ALJ found these opinions persuasive, noting that "[b]oth doctors supported their opinions with a review of [Plaintiff's] medical records available to them at [the time], which showed ongoing reports of joint pain[,] swelling[,] and diffuse bodily pain but also revealed generally normal physical examination findings." (Tr. at 709.) The ALJ also noted that the consultants' opinions "are mostly consistent with the record as a whole, including objective imaging showing only minimal signs of degenerative changes, as well as clinical finding of normal musculoskeletal ranges of motion, strength, muscle bult and tone, motor and sensory function, and gait." (Tr. at 709.) Nevertheless, the ALJ found it "reasonable to limit [Plaintiff] to a reduced range of light work as indicated in the [RFC] to fully accommodate [Plaintiff's] reports of ongoing pain that has waxed and waned." (Tr. at 709.) The ALJ went on to explain that no medical opinion evidence supported physical limitations greater than those included in Plaintiff's RFC. (Tr. at 708-10.) The ALJ also chronicled the relevant treatment notes in detail in her decision. (See Tr. 705-08.) Accordingly, the ALJ did not rely Plaintiff's daily activities alone as indicative of her physical functional abilities, nor did she overstate them as in Woods, Arakas, and similar cases.

Finally, Plaintiff also contends that the ALJ improperly relied on Plaintiff's ability to testify at the hearing and attend medical appointments, as well as her activities during the day such as caring for her son, doing physical therapy exercises, and watching tv or reading for short periods, without explaining how those activities were relevant to Plaintiff's ability to work a full day. (Pl. Br. at 11.) However, the ALJ considered these activities narrowly in the context of Plaintiff's mental limitations, and explained exactly how those activities reflected Plaintiff's abilities, consistent with the medical record including the mental status examinations. With respect to Plaintiff's alleged difficulties understanding, remembering, concentrating, and persisting, the ALJ noted that "mental status examinations conducted during the period at issue typically found her to be alert and oriented with intact memory, attention, thought processes, thought content, judgment, insight, and cognition" and "[t]hese findings comport with the claimant's reported activities of daily living and presentation at the hearing." For instance, "[a]t the hearings, [Plaintiff] was able to follow along during questioning and provide clear and relevant testimony to me without asking for much repetition or explanation" and "also stated that she is able to watch television, read for short periods, and act as the primary caretaker for her young son" reflecting her ability to understand, remember, and apply information and her ability to concentrate, persist, and maintain pace. (Tr. at 701.) Similarly, the ALJ noted that Plaintiff's relationship with her family, her conduct at medical appointments, where she was pleasant and cooperative, and her communication and responses at the hearing, all "indicates capacity to manage herself and interact with others." (Tr. at 701-02.)

Thus, the ALJ reasonably considered Plaintiff's activities in context, and explained how those activities were relevant, and also considered a multitude of other factors based on the evidence in the record as a whole. The determination was supported by substantial evidence in the record, and Court finds no basis for remand.

B. Mental limitations

Plaintiff next contends that, in assessing her RFC, the ALJ erred by failing to include, or explain the absence of, mental RFC limitations "to account for Plaintiff's 'mild' limitations in all four Paragraph B criteria and 'nonsevere' mental impairments." (Pl.'s Br. at 1, 14-20.) This contention relates to the ALJ's analysis of Plaintiff's post-traumatic stress disorder ("PTSD"), depression, and anxiety, which the ALJ addressed at step two of the analysis, and found to be "nonsevere" impairments that did not cause "more than a minimal limitation" in Plaintiff's ability to do basic work activities. (Tr. at 701-03.) Specifically, at step two of the sequential analysis, the ALJ acknowledged that Plaintiff's PTSD, depression, and anxiety constituted medically determinable mental impairments. (Tr. at 701.) However, she further determined that these impairments, "considered singly and in combination, [did] not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and [were] therefore nonsevere." (Tr. at 701.) As part of the analysis, the ALJ specifically considered the four broad areas of mental functioning, also known as the "paragraph B" criteria, set out in the regulations. (Tr. at 701-03.); see also 20 C.F.R., Part 404, Subpart P, Appendix 1, 12.00E. These areas of mental functioning are (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, and maintaining pace; and (4) adapting and managing oneself. (See Tr. at 702-03.) For each of

14

these areas, the ALJ must rate Plaintiff's degree of limitation as none, mild, moderate, marked, or extreme. 20 C.F.R., Part 404, Subpart P, Appendix 1, 12.00F(2).

In the present case, the ALJ found that Plaintiff had mild limitations in all four functional areas. (Tr. at 702–03.) In making these findings, the ALJ set out her rationale at length:

> The first functional area is understanding, remembering or applying information. In this area, the claimant has mild limitation. The claimant has a high school education and on examination and treatment, she typically had intact memory, thought processes, thought content, judgment, insight and cognition. At the hearings, she was able to understand and answer all questions posed by the representative and by me without asking for much repetition or explanation. This suggests that she is able to understand, remember, and apply information to specific questions. In addition, she stated that she is able to serve as the primary caretaker for her young son, which indicates an intact capacity to understand, remember, and apply childcare techniques to care for her son. Further, according to the record, she has not received any mental health treatment since February 2021, which suggests her symptoms are not as limiting as alleged.
>
> The next functional area is interacting with others. In this area, the claimant has mild limitation. The claimant alleges social avoidance and difficulty interacting with others—particularly men. However, medical providers often described her as cooperative, and as having an appropriate mood and affect, although they did describe her to appear anxious, depressed, and agitated or tearful at times. Her providers also noted her to have normal speech and good eye contact during most appointments. Further, the treatment notes do not consistently document reports of difficulties getting along with others or the like. At the hearing, she communicated and responded to all questioning in an appropriate manner. She stated that she lives with her boyfriend and young son, and that she attends regular medical appointments, which suggests some ability to interact with others. Further, according to the record, she has not received any mental health treatment since February 2021, which suggests her symptoms are not as limiting as alleged.
>
> The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has mild limitation. The claimant alleges difficulty concentrating and persisting. However, mental status examinations typically found her to be oriented with intact attention and thought processes. At the hearing, she reported that she is able to act as the primary caretaker for her

15

young son—an activity that requires concentration to complete. At the hearing, she also was able to follow along during questioning and provide clear and relevant testimony to me without asking for much repetition or explanation—indicating an ability to concentrate, persist, and maintain pace for simple tasks. Further, according to the record, she has not received any mental health treatment since February 2021, which suggests her symptoms are not as limiting as alleged.

The fourth functional area is adapting or managing oneself. In this area, the claimant has mild limitation. The claimant alleges difficulty handling stress and adapting to changes in routine. However, medical providers often described her as cooperative, and as having an appropriate mood and affect, although they described her to appear anxious, depressed, and agitated or tearful at times. Her providers also noted her to have normal speech, good eye contact, and intact grooming during appointments. In addition, though she alleges significant mental distress, her providers often found her to be in no acute distress during appointments. At the hearing, she reported that she is able to care for her young son and attend medical appointments—indicating an ability to manage herself appropriately. The claimant alleges difficulty handling stress and adapting to changes in routine. However, medical providers often described her as cooperative, and as having an appropriate mood and affect, although they described her to appear anxious, depressed, and agitated or tearful at times. Her providers also noted her to have normal speech, good eye contact, and intact grooming during appointments. In addition, though she alleges significant mental distress, her providers often found her to be in no acute distress during appointments. Further, according to the record, she has not received any mental health treatment since February 2021, which suggests her symptoms are not as limiting as alleged.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1)).

(Tr. at 702-03) (internal citations omitted) (emphasis omitted). Notably, Plaintiff does not challenge the ALJ's finding that her mental impairments were nonsevere. Rather, citing Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015) and its progeny, she argues that the ALJ was required to address Plaintiff's "mild" paragraph B limitations when assessing Plaintiff's RFC, or explain the absence of corresponding limitations.

However, Plaintiff's argument that her mild limitations should have been accounted for in the RFC is not supported by the Fourth Circuit's decision in Mascio and or the weight of subsequent decisions in this Court. In Mascio, the Fourth Circuit held that if moderate limitations in concentration, persistence, or pace are reflected at step three, the ALJ should address those limitations in assessing the RFC or should explain why the limitations do not affect the claimant's ability to work. The Fourth Circuit further noted that

> [p]erhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity. For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. But because the ALJ here gave no explanation, a remand is in order.

Mascio, 780 F.3d at 638 (internal citation omitted).

In the present case, unlike in Mascio, the ALJ found only mild, rather than moderate, restrictions in functioning. (Tr. at 702-03.) More recent cases in this District have held—almost universally—that "the weight of post-Mascio authority among the district courts in the Fourth Circuit does not favor extending Mascio to mild limitation[s]." Spradley v. Saul, No. 1:20CV337, 2021 WL 1739013, at *7 (M.D.N.C. May 3, 2021) (collecting cases); Pickett v. Kijakazi, No. 1:21cv500, 2022 WL 3908862, at *3–4 (M.D.N.C. Aug. 30, 2022); Baucom v. Saul, No. 1:18CV819, 2020 WL 978256, at *10 (M.D.N.C. Feb. 28, 2020).

Moreover, in this case the ALJ made these findings in the course of her discussion at step two of the sequential analysis, supporting her conclusion that Plaintiff's mental impairments do not cause "more than a minimal limitation in [her] ability to do basic work activities" and are therefore nonsevere. (Tr. at 703.) See 20 C.F.R. § 404.1520a(d)(1)

(providing that if the degree of limitation in the functional areas is only "none" or "mild," the impairment is not severe, unless the evidence otherwise indicates a more than minimal limitation in the ability to do basic work activities). This analysis differs from the typical Mascio scenario, in which the ALJ, having already identified one or more mental impairments as severe at step two, then performs a step three evaluation as to whether the degree of functional limitation resulting from Plaintiff's mental impairment(s) meets or equals a listed impairment. The typical Mascio challenge therefore stems from the ALJ's failure, or alleged failure, to include limitations from the claimant's severe impairments in the RFC.

This distinction is significant. "Basic work activities" are defined as functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering simple instructions, using judgment, responding appropriately to co-workers and supervisors, and dealing with changes in a routine work setting. 20 C.F.R. § 404.1522(b). Here, the ALJ found that Plaintiff's mental impairment was nonsevere, meaning that it resulted in no more than a "minimal limitation in [her] ability to do basic work activities." (Tr. at 701, 703.) See Brownlee v. Saul, No. 1:18CV642, 2019 WL 3858652, at *7 (M.D.N.C. Aug. 16, 2019); Kimberly B. C. v. Kijakazi, No. 1:22CV617, 2023 WL 4974033, at *5–7 (M.D.N.C. Aug. 3, 2023).

Finally, the Court notes that in this case, the ALJ did provide additional explanation in setting the RFC. See also 20 C.F.R. § 404.1523(c) (requiring that ALJs consider cumulative limitations from both severe and nonsevere impairments when assessing a claimant's RFC). When discussing her rationale for setting the RFC in this case, the ALJ noted Plaintiff's testimony regarding "symptoms of social avoidance, anhedonia, nightmares and flashbacks to

18

traumatic events, and paranoia." (Tr. at 705.) The ALJ also acknowledged Plaintiff's reports of "anxiety, PTSD, and difficulty being around people." (Tr. at 706.) In terms of treatment for these conditions, the ALJ noted that Plaintiff "said she has been taking anxiety medication since 2017" and that "she has been trying to find the right therapist[,] but they keep placing her with young men and she does not feel safe opening up to them." (Tr. at 706.) However, the ALJ found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 706.) Particularly with regard to Plaintiff's mental impairments, the ALJ noted that the evidence "documents no consistent ongoing treatment since 2021 for any mental impairment." (Tr. at 709.)[5] As part of that discussion, the ALJ also specifically considered the opinions of the State agency psychological consultants, specifically the opinion of Dr. Grover in June 2020, who found that Plaintiff had moderate limitations in each of the paragraph B functional areas. As a result of these limitations, she opined that Plaintiff could perform simple, routine, repetitive tasks in a stable, low pressure setting with minimal social interaction with coworkers and supervisors. (See Tr. at 709.) The ALJ nevertheless concluded that the treatment record did not support these limitations, particularly in light of Plaintiff's lack of any treatment for any mental impairment for over two

---

[5] Records from the Center for Emotional Health reflect that Plaintiff was last seen on February 4, 2021, more than two years before her hearing. (Tr. at 1051.) At that appointment, Plaintiff noted her intent to stop taking mental health medications. It does not appear that Plaintiff sought care for her mental impairments again until January 9, 2023, when she presented at Kintegra Health for the purpose of establishing care and getting a referral for therapy. (Tr. at 1113.) However, as noted by the ALJ, records from January 2023 also indicate that she declined any anti-anxiety medication and had "normal memory, appropriate mood and affect, and has been fully oriented." (Tr. at 702, 1207, 1212.) In addition, the records received through the date of the ALJ's decision eight months later do not reflect that Plaintiff began therapy or any other treatment during that time. Similarly, Plaintiff's more recent medical records and self-reports do not document the use of any medications for her mental conditions. (See Tr. at 1020, 1111.)

19

years. (Tr. at 709.) Thus, the ALJ explained why there was no mental limitation in Plaintiff's RFC, and Plaintiff's Mascio challenge is without basis. See also Shinaberry v. Saul, 952 F.3d 113 (4th Cir. 2020). As such this contention fails to provide a basis for remand.[6]

IT IS THEREFORE ORDERED that the Commissioner's decision finding of no disability is AFFIRMED, that Plaintiff's Dispositive Brief [Doc. #8] is DENIED, that Defendant's Dispositive Brief [Doc. #10] is GRANTED, and that this action is DISMISSED with prejudice.

This, the 28th day of March, 2025.

Joi Elizabeth Peake
United States Magistrate Judge

---

[6] The Court also notes that in the course of Plaintiff's hearing, the ALJ questioned the vocational expert regarding the impact of mental limitations on Plaintiff's ability to perform the jobs identified at step five of the sequential analysis. Notably, when presenting mental limitations to the vocational expert, the ALJ included limitations equal, if not greater, than the most stringent opined by the State agency consultants. She identified, in pertinent part,
> [a] hypothetical individual [who] can understand, remember and/or carryout simple or unskilled work [of] a routine and repetitive nature, can maintain attention and concentration for at least two-hour periods of time sufficient to carry out that work over the course of a normal workday and a normal workweek. Can adapt to routine and frequent workplace changes at a non-production pace, meaning no assembly line or conveyor belt type work, and can tolerate occasional interaction with the public and frequent not constant interaction with coworkers and supervisors, meaning not requiring work in tandem.

(Tr. at 761.) In response to this hypothetical, the expert identified both light and sedentary occupations such an individual remained capable of performing. (Tr. at 761-62.) The ALJ later adopted these findings at step five of the sequential analysis. (Tr. at 711.) Thus, the record demonstrates both that (1) the ALJ considered mental limitations but decided not to include them in the RFC based on the analysis set out in the decision, including the lack of mental health treatment for over two years, and (2) even if those limitations were included in Plaintiff's RFC, it would not alter the ALJ's ultimate finding of no disability. Plaintiff fails to suggest if or how this showing was insufficient or present any other credible basis for remand.